The next case on the calendar is Flood v. Just Energy Marketing. Good morning, Your Honors. May it please the Court. My name is Nicole Fiorelli, and I, along with my co-counsel Katherine Anderson, represent Mr. Flood and the plaintiff workers in this wage and hour case. May I please reserve three minutes for rebuttal? Thank you. The Fair Labor Standards Act is a remedial statute, and the exemption should be narrowly construed. It was therefore error for the District Court to find, as a matter of law on summary judgment, that the plaintiffs here should be denied the protections of the wage and hour laws on the basis that they were exempt under the outside salesman exemption. If I may briefly paint the picture here of the type of worker that the District Court found to be exempt as a matter of law. This is a job which requires absolutely no sales experience. In fact, no level of education is required. Even a high school diploma is not required for this job. These workers are heavily controlled by Just Energy. They are told what time to get to the office in the morning. They are told where to work. They are driven out in vans to the location of the day, which they are not allowed to choose. They are to stay out there and to knock on doors until the day is done and the van goes back to the office at the end of the day. Now, I thought your client testified that individuals were able to go out on their own, though they generally went in the van, and that he and others did not always have to return to the office at the end of the day. Am I wrong about that? With permission, Your Honor. It was by the permission of the company. They also had to follow a script when they were out in the field, and their hours were quantifiable. The company knew where they were at at all times. They came to the office first thing in the morning, and then they were driven back to the office at night. Their hours were quantifiable. They were controlled. This does not fit the purpose of the outside sales exemption. We're supposed to look at the text, of course, of the provision, and it says whose primary duty is making sales. Of course, there's an alternative holding as well from Judge Forrest. Why isn't this reasonably, really, intellectually viewed as making sales? Correct, Your Honor. We do look at the text, and actually, Section 213 of the statute requires that we look at whether someone's acting in the capacity of a salesperson. The U.S. Supreme Court in Christopher has held that we have to look at the condition, the factors, basically, the picture of whether this person meets the outside sales test. No one else, as Judge Forrest asked, there's no one else making the sale. He's the person who's introducing the product to the client and getting the commitment from the client. He is introducing the product, correct, but he's only getting a commitment insofar as Just Energy approves the deal. Now, I think... That's always true, right? I mean, any case in which you've got agents selling something, presumably the principal or the company is going to have some sort of reservation, very reasonably so, over the credit and the like, right? I think it's a question of whether it's just a formality for the deal to go through or whether there's some other steps, the approval process that the employer or the company has to take. I'd like to point to Christopher. There's three situations where the courts have outlined and Christopher has outlined where, okay, the employee is not the one actually finalizing the deal. So let's look at three different situations and whether the exemption is destroyed or not. So Christopher at 2170 talks about the fact of whether or not the exempt... Whether it's technicalities, okay? So, for example, the salesperson gets the deal and it's another person back at the office who hits the return button on the computer and that's the step that finalizes the deal. Technicality like that or data entry is not going to destroy the exemption. Second situation, like in the case of Christopher with the pharmaceutical reps, if it's a regulation or some law that precludes the individual from completing the sale, that is not going to destroy the exemption. However, when you have someone else or the company who is stepping in to close the deal, that is going to destroy the exemption and that is the finding in Clements v. Serco, Wirtz v. Readers, Burling v. Realstone, the district court in Hurt v. Just Energy, the district court in Wilkins v. Just Energy. It matters to those courts whether or not it is the employee who's taking steps to close the deal or whether it's someone else. And in this instance, the worker has absolutely nothing to do with running the credit check or looking at any other financial or other considerations once they leave that door. It's out of their hands. Now, that's one part of the . . . Supposing that we agreed with you on that, why wouldn't the district court's conclusion be equally supportable on the second prong for one who obtains orders or contracts for a deal has not been closed in some way? I think that the finality component or the ability to close still applies there. For example, in the Burling case, that alleged salesperson was obtaining orders from a dealer to sell stone. And yet, the court still looked at this finality component and the fact that the employer was the one to ultimately approve the dealer. That fact . . . And the fact of the regulations. Am I misunderstanding it? I mean, why do you read Christopher to turn on the fact that there were regulations that govern the pharmacy detailers? Because they talked about how these workers were basically doing all that they could do to get a commitment from the doctor, but they were precluded from actually getting a binding commitment from the doctor due to the regulations. Christopher also, importantly, looked at two other things. The indicia of a salesperson and the purpose of the act. And the court found in that situation that those were satisfied and the exemption applied. Now, in our case, respectfully, the district court got that wrong. The district court in this case did not look at the fact questions on the indicia and the purpose elements. The 6th Circuit Court of Appeals, when Just Energy, after they lost at trial in Ohio, moved for interlocutory appeal, found there were mixed questions of fact and law that the jury found in plaintiff's favor. The Ohio court did not look at the alternative prong, did it, of obtaining orders or contracts for services? That was . . . . . . to make that finding, did it? It was not in his jury instructions. However, he considered that aspect by referring to them as applications in his . . . He kind of indirectly refers to it, but it seems to me that that dooms your res judicata or collateral estoppel argument, doesn't it? Your Honor, I would contend no, because I believe that the finality component and the indicia component apply to the orders or contracts. We have a court in New York that's made a finding, essentially, that you lose for two separate reasons. The Ohio court concluded that you win for only one reason, but without considering the second reason. So it seems to me that it's very hard for you to argue that the Ohio judgment or any other judgment that didn't consider that second prong, as Judge Forrest did, operates by its collateral estoppel. The district court in Ohio noted that the jury verdict was supported notwithstanding the disputed instruction about the making sales. In other words, he gave them a list of the indicia of what makes a salesperson. We're not talking about the making sales prong. We're talking about the independent prong, the obtaining orders or contracts for services. That wasn't submitted to the jury. Right, Your Honor. And I guess my point is that these are all facets of the outside sales exemption, the making sales or obtaining orders, the indicia, whether the purpose of the act is satisfied. He noted in his post-trial order that the jury verdict was supported notwithstanding the making sales part because of the fact that the indicia could have supported the jury's conclusion that these people were not, in fact, outside salespeople. And I believe that the indicia component and whether the purpose of the act are satisfied, it's not just some throwaway. I mean, the Supreme Court and Christopher expressly, they just said, okay, these people are making sales, yet they went through the analysis on these other two portions. And it's a liberal statute and the exemptions are supposed to be narrowly construed so it's appropriately a fact question to send to the jury. And I think I am into my rebuttal time, so I will sit down unless there's further questions. Thank you very much. Good morning, Your Honors. My name is Bradley Sherman and I'm here to represent Just Energy Marketing Corp., Just Energy New York Corp., and Just Energy Group, Inc. And may it please the Court, I'd like to talk to you a little bit about this case. I'd like to jump in, if it would be okay with you all, to one of the issues that you were just talking about and you were inquiring from Plaintiff's Counsel, excuse me, from Counsel for the Appellant. And that's having to do with the issue of the sales exemption itself. There is really, as was correctly pointed out by Your Honors, there were two issues here that Judge Forrester found in favor of my clients, which was both that they were making sales and that they were also obtaining orders and contracts. And yes, the Hurt Court does not address the second issue. It was an issue that was argued in front of that Court and they made a decision not to instruct the jury on that point. So in essence, they made a decision not to allow that to go to the jury. As it relates to the sales, I think Judge Forrester put it best when saying, if they're not doing sales, then what are they doing? Really this indicia, these other factors that appellants look to, have to do when you're trying to make a determination between whether someone is doing sales or whether someone is doing more promotional type work. Trying to make the, trying to draw the line between sales and marketing. And the major instance is the individual conducting sales are doing certain work for the purposes of closing their own sale or they're doing it for someone else's sales efforts. And the other part, which is that they weren't really making the sales. That just energy was ultimately making the sale in terms of accepting these contracts is just not supported by the record. As a matter of fact, the primary plaintiff in this case, Mr. Flood, said that there was never a situation in which an individual, that he could think of a sale that was arbitrarily rejected. That all his sales, unless there was a mistake that was usually caused by information being filled in correctly. Wasn't the record evidence that about 30% of the sales were rejected by the company? There is definitely a situation where a lot of those sales were rejected. So it's a large number. There is a large number of sales that are rejected, but they can all be traced back to a couple of different factors. Number one, the customer, his or herself, makes a decision to no longer go forward with the sale. And in any sales situation, the customer has a right and specifically in this situation, they have a right to cancel their contract at a particular time. They also have the, there are also those sales that didn't go to what they call flowing customers because the individual, the salesperson didn't complete the sales paperwork correctly. They wrote down wrong registration numbers. They didn't fill out the information correctly. And the final situation which was brought up by appellate counsel is that there was a credit check that an individual didn't, that the person couldn't qualify for getting a utility turned on because they had bad credit. And that accounts for the entire 30% essentially, those three components? Yes. Those three components account for the entire percentage. And as a matter of fact, the record, and supported by Flood, who said he didn't know of any situation where it was arbitrarily rejected. And he even went as far to say that really Just Energy had every sales because they didn't make any money unless they became new customers. The purpose of the outside sales exemption is essentially not to apply the FLSA in instances where you've got basically people who are off the premises, doing what they're doing. How is that purpose served here where it's so clear, it seems so clear that Just Energy has basically got its thumb on these folks. It's driving them out in the van, telling them where they have to go, making them wear the company t-shirt or logo, and then picking them up at the end of the day. And I think pre-ordaining their script. How is it then that, apart from the text, and I understand the text is important, but when we look at just what the purpose of this provision is, how is it served here? I would answer that, Your Honor, in a couple different ways. First and foremost, I'd point out that this is the issue of control. Every other case that has similar types of indicia have held that that still wasn't sufficient to disrupt the exemption. Jewel Tee and the Tenth Circuit, where they had specific territories and visiting customers on a regular schedule, they had sales quotas, they had sales scripts, they went out with sales managers ahead, not to be sufficient control. Nielsen, which is a Western District of Michigan case, similar situation. Schaefer v. LaRose, Lane, Baum, all these cases that were cited in the brief, none of these cases, they had all these types of control factors, it still wasn't enough. But to answer your question directly as it relates to the purpose of the Act, in this circumstance that Just Energy developed a sales program that would give these individuals the best chance for success, again, their interests were aligned, they wanted sales. The idea that they had sales scripts, that worked. That they had, that when people show up in uniforms, they're usually more trusted at the door. All these types of factors were designed to help these individuals be more successful at their sales and at obtaining contracts. The idea, though, that somehow, that because, but when it came to the actual ultimate moment of truth, where they were at the door and they were selling this individual or obtaining the contract from this individual, in those circumstances, it was just the individual and the potential customer. That was it. So there wasn't someone, it wasn't like a call center, it wasn't a situation where an individual, where there were sales managers that were on the, there with the individual telling them what to do. When it was the moment of truth, where the rubber met the road, they were there by themselves and they weren't being controlled. What I would suggest in terms also, that the control factor is just one of several indicia of sales. And indicia, again, as we pointed out in our briefing, indicia is usually the case when you had mixed type situations and you were trying to determine, is this more promotions, is this more sales? And in this particular circumstance, if you look at all the other factors, they all weigh in favor of it being a sales position. 100% commissioned, the concept that they were soliciting new business for themselves, they were the ones that were closing, that he received sales training, the record says he received orientation training, he received daily sales meetings, he shadowed people out in the field. Now he had prior sales experience, but absolutely, appellants was correct, it was not required. This was an entry level sales position, obviously the more experience you had, the better you'd be at it, but it was not a required element. But all the other factors weighed in favor of the indicia of sales. If this court believes that it needs to go to the indicia of sales and can't just stay with the text of the statute and the regulations. He was actually a manager in the way these sales operations went and worked, that there were sales people, but more experienced, more successful sales people would help train the others. Not Mr. Flood. Mr. Flood was not what they called crew coordinators and regional distributors, he was not one of those. He was just a field sales person or field agent. As it relates to the concept of consummation, the idea that the deal has to be finished at the door, which is really an important part of appellant's argument, respectfully that concept which was developed by Judge Gwynne in the Hurt case really didn't come from anywhere. It came from his, what he did was he posited out there and then used Christopher and then distinguished from that point. There is nothing in the statute, there is nothing in the regulations, there is nothing in any jurisprudence other than one case that says consummation is required. What the Christopher, what the Supreme Court was trying to do in Christopher was trying to say, you know what, we want to expand the definition of sales. As a matter of fact, the Supreme Court says that we want to be more expansive than the ordinary meaning. They weren't trying to limit it and say no, it has to be consummated at the door. They were trying to say there are other situations that look like sales that may ultimately become sales. And I think that that's an important distinction. There isn't a case out there that should, that stands to the proposition that consummation is required. Consummation is simply, and in this particular circumstance, and it's in most sales circumstances, even life insurance, there still has to follow a health background, there still has to be some conditions subsequent prior to a sale. It doesn't render everything that they're doing non-sales related. As a matter of fact, I would posit that if the, if everything was the same, and they did everything else the same, but that contractual provision read slightly differently that said, and didn't, and didn't have the ability for just energy to reject, that the actual work performed, the primary duty of the individual would still be the same. It would not ultimately transform it from sales to non-sales. Appellants would like this court to believe that there's a distinction between sales, which is what's talked about in the statute, and this concept of exempt sales. That concept doesn't exist under the law. It's whether or not they're engaged in sales away from the place of work. That's what the outside sales exemption means. If there's no further questions, Your Honors, thank you so much for letting me be heard. Thank you. May I please the court? I'd like to address two things that Mr. Sherman discussed. One, Your Honor, Judge Meyer, you had asked him about how the purpose of the act would be this issue of, part of the reason why outside salesmen are exempt is because their hours are not easily quantifiable. The employer doesn't know where they are. It's hard to keep track of them. He did not address that at all, because there's no denying the fact that they can track these hours. In fact, as of January 2015, they do track the hours and pay these people hourly. What are the other reasons why outside salespersons are exempt, other than tracking? A big one is tracking and the level of supervision. Then the other part is that the outside salesmen are thought to have benefits and a higher salary. Commission, right? I'm sorry? Commission, essentially, right? Yes, but they're thought to end up making more money and having benefits, which that's not the case here. I mean, Plain of Flood was an exception, but the vast majority of these people did not make very much money, as we submitted through declarations on summary judgment. Mr. Sherman indicated that the judge in Hurt sort of went out on a limb here in creating this consummation requirement. As I talked about a little bit in my opening, that's not the case. I mean, there's case law in terms of Wirtz, Clements, Burling. In fact, if you look at the Supreme Court's decision at 2174, the Supreme Court references an opinion letter from the DOL, and it was a situation where employees were incapable of selling any good or service because their employer had yet to extend an offer. And they cite the DOL letter, 1999 Westlaw 100-2391, concluding that college recruiters are not exempt because they merely induce qualified customers to apply to the college, and the college in turn decides whether to make a contractual offer of its services to the applicant. That's the Supreme Court recognizing that. This is not the Hurt judge going out on a limb. This is the Supreme Court in Christopher recognizing that when the employer or the offerer of the decision about whether to admit somebody is a very different kind of decision than for Just Energy deciding whether it's going to provide energy, is it? I don't think so, Your Honor. Yes, the facts are different, but Very discretionary in that sense, and Just Energy's essentially got just kind of pure business reasons, but It was discretionary in terms of credit. They set the line of credit. Why couldn't the person at the door run a credit check or decide based on income or what have you that the person was going to be an acceptable customer? They had nothing to do with the deal after they left the door. So for these reasons, Your Honor, we respectfully request that you reverse the district court's decision, finding these workers exempt as a matter of law. Thank you very much. Thank you both for your arguments today. Thanks for coming in. Nicely done. So we only had two cases today, so that concludes our calendar, and I'll ask the clerk to adjourn court.